UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ROBYN HOLTZAPPLE,**

    **Plaintiff,**

v.                                      **Case No: 6:17-cv-2026-Orl-41GJK**

**NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,**

    **Defendant.**
                                           /

## ORDER

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 37). Plaintiff filed a Response in opposition (Doc. 65), to which Defendant filed a Reply (Doc. 68). For the reasons set forth below, Defendant's Motion will be denied.

### I. BACKGROUND

On or about March 22, 2006, non-party Lisa Talley was involved in an automobile accident with Plaintiff. (Talley Aff., Doc. 65-3, at 1). The collision resulted in permanent injury to Plaintiff. (June 11, 2007 Letter, Doc. 52-1, at 19). At the time of the collision, Talley was insured under a policy issued by Defendant. (*See generally* Apr. 21, 2006 Letter, Doc. 2-1). The policy had a bodily injury limit of $50,000 per person and $100,000 per occurrence. (*Id.* at 3).

The following day, Talley informed Defendant of the collision. (*See* Activity Log, Doc. 51-1, at 185–88). Adjuster Tamara McNeil was assigned to the claim. (Whisler Dep., Doc. 50-1, at 19:12–14). McNeil determined that Talley was one hundred percent liable for the collision. (Doc. 51-1 at 187).

On April 17, 2006, Defendant received a letter of representation from Plaintiff's counsel.[1] (*See generally* Apr. 13, 2006 Letter, Doc. 51-2). Therein, Plaintiff's counsel notified Defendant that Plaintiff would be seeking a claim for injuries and damages she sustained as a result of the collision. (*Id.* at 1). In response, prior to receiving any medical records, Defendant set the reserve at $8,000 for Plaintiff's injuries, noting that the collision was "a pretty good impact" and Plaintiff had no prior injuries. (Doc. 50-1 at 40:24–41:4, 42:22–43:1). On February 19, 2007, Plaintiff's counsel advised Defendant that a demand package would be sent once Plaintiff completed her medical treatment. (Feb. 19, 2007 Letter, Doc. 42-2, at 1).

On June 11, 2007, Plaintiff's counsel sent Defendant a demand package. (*See generally* Doc. 52-1). Plaintiff's treating physician, Dr. Peter Brockman, diagnosed Plaintiff with a "cervical disc herniation, cervical sprain/strain, thoracic sprain/strain[,] and lumbar sprain/strain." (*Id.* at 3). Dr. Brockman assigned Plaintiff a thirteen percent permanent impairment rating, affecting the body as a whole, as a direct result of the collision. (*Id.*). Chiropractic records indicated that Plaintiff was treated approximately thirty-four times from March to July 2006. (Radiographic Report, Doc. 53-1, at 5–12; Radiographic Report, Doc. 54-1, at 1–15). The demand package also noted that Plaintiff had attained maximum medical improvement on June 26, 2006, and had incurred $10,210.10 in medical expenses, with an additional $8,000 in anticipated future medical costs. (Doc. 52-1 at 3–4). Consequently, Plaintiff demanded $167,500 to settle her claim against Defendant. (*Id.* at 1).

After receiving Plaintiff's demand package, Defendant continued to maintain its reserve of $8,000. (Doc. 50-1 at 67:11–21). Linda Myrick, the new adjuster assigned to Plaintiff's claim,

---

[1] References to Plaintiff's counsel refer to the counsel Plaintiff retained for her initial state court proceedings, not Plaintiff's counsel in this matter.

evaluated the claim and assessed $1,500 for "special damages economic loss" and up to $6,500 for "general damages/non-economic" loss. (Doc. 50-1 at 45:11–13, 57:16–58:10, 60:2–17). Despite this, Defendant responded by sending Plaintiff a counteroffer to settle the claim for $5,000 and requesting additional medical records.[2] (June 28, 2007 Letter, Doc. 45-1, at 1). Plaintiff rejected Defendant's counteroffer and informed Defendant that she was seeking the policy limits. (Oct. 30, 2007 Letter, Doc. 56-5, at 1). Defendant increased its settlement offer to $6,000 on December 19, 2007. (Dec. 19, 2007 Letter, Doc. 45-3, at 1). Plaintiff rejected the offer, reiterating her demand for the policy limits. (Dec. 19, 2007 Letter, Doc. 45-4, at 1).

On January 8, 2018, Myrick asked her manager, Joseph Fowler, to review her valuation of Plaintiff's claim. (Activity Log, Doc. 40-1, at 19). Fowler reviewed the file, (*see* Fowler Dep., Doc. 33-4, at 32:7–17), and increased the reserve to $25,000 based on the medical records that had been received, (*id.* at 28:1–7).

On January 31, 2008, Defendant requested that Plaintiff provide her MRI films for review. (Jan. 31, 2008 Letter, Doc. 45-5, at 1). On March 5, 2008, Plaintiff's counsel sent Defendant a report from a neurological consultation and reports from MRIs. (Mar. 5, 2008 Letter, Doc. 45-6, at 2–8). The letter noted that Plaintiff had suffered a posterior disc herniation of the lumbar region and had incurred close to $4,000 in outstanding medical specials. (*Id.* at 1). Additionally, the letter advised that Plaintiff was continuing treatment and was contemplating cervical epidural steroid injections recommended by her treating physician, Dr. Jonathan Greenberg. (*Id.*). No surgical

---

[2] The parties dispute when Defendant sent their counteroffer. Defendant claims the letter was sent on June 28, 2007. (*See* Doc. 45-1, at 1). Plaintiff contends that it was not sent until October 25, 2007, (*see* Oct. 30, 2007 Letter, Doc. 56-5, at 1), after Plaintiff's counsel advised Defendant that she was still waiting for a response to the demand package, (Sept. 20, 2007 Letter, Doc. 56-4, at 1).

recommendations were made at the time. (*See generally id.*; *see also* Muir Dep., Doc. 49-2, at 57:14–17).

Defendant again requested the MRI films on April 25, 2008, as well as any other medical records that had not been previously sent. (Apr. 25, 2008 Letter, Doc. 56-10, at 1). On October 13, 2009, Plaintiff provided medical records for chiropractic care she received from January 2007 through September 2009. (Oct. 13, 2009 Fax, Doc. 56-11, at 2–21). During that time, Plaintiff received treatment approximately thirteen times, and her medical bills totaled $9,715.05. (*Id.* at 10–17, 21). In response, Defendant increased its settlement offer to $10,000. (Dec. 1, 2009 Letter, Doc. 56-12, at 1). Plaintiff rejected Defendant's offer on December 9, 2009, noting that Plaintiff had incurred close to $5,000 in out of pocket medical expenses and was still undergoing treatment. (Dec. 9, 2009 Letter, Doc. 56-13, at 1).

On January 5, 2010, Plaintiff's counsel and Defendant engaged in further settlement negotiations. (Doc. 51-1 at 93; Muir Notes, Doc. 36-4, at 5). The parties largely dispute the contents of that discussion but agree that Plaintiff was willing to accept $45,000 to settle the claim. (*Id.*). Additionally, the parties agree that Defendant countered with an increased offer but disagree as to the amount that was offered. (*See id.*).

On March 3, 2010, Plaintiff provided Defendant with medical records for treatment Plaintiff received from an orthopedic surgeon, Dr. Scott Katzman. (*See generally* Mar. 3, 2010 Letter, Doc. 47-1, at 1). Dr. Katzman recommended a conservative treatment plan for Plaintiff, including medication and injection therapy, and noted that surgery could be pursued in the event conservative treatment did not work. (*Id.* at 4). Dr. Katzman administered an epidural block to Plaintiff's lumbar spine and documented some improvement before Plaintiff's pain began slowly trickling back. (*Id.* at 6–8). Dr. Katzman advised Plaintiff to try more oral medicines before

proceeding with a more aggressive plan of treatment. (*Id.* at 8). Additionally, the March 3, 2010 letter informed Defendant that the statute of limitations was expiring in three weeks and offered to settle Plaintiff's claim for the policy limits if tendered by March 12, 2010. (*Id.* at 1). Defendant made a counteroffer of $17,500 on March 10, 2010. (Mar. 10, 2010 Letter, Doc. 47-2, at 1). Plaintiff filed suit on March 16, 2010, and was no longer willing to settle her claim for the policy limits. (*See* Copeland Dep., Doc. 33-2, at 32:10–14). Final judgment was awarded in favor of Plaintiff in the amount of $1,696,826.[3] (Final J., Doc. 2-2, at 2).

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer v. Sw. Airlines*

---

[3] Prior to trial, Plaintiff underwent two surgeries for her lumbar spine. (Copeland Dep., Doc. 49-1, at 45:7–14).

*Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251–52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III. ANALYSIS

Under Florida law, "[a]n insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). "The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* Furthermore, "an offer to settle is not a prerequisite to the imposition of liability for an insurer's bad faith refusal to settle, but is merely one factor to be considered." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991). Rather, "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Id.*

"[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). "Each case is determined on its own facts and ordinarily '[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury.'" *Id.* (quoting *Bos. Old Colony*, 386 So. 2d at 785). Nonetheless, in limited circumstances, the Court may determine that there is no evidence upon which a reasonable jury could make a finding of bad faith at the summary judgment stage. *See id.* ("Although the issue of bad faith is

ordinarily a question for the jury, this Court and the district courts have, in certain circumstances, concluded as a matter of law that an insurance company could not be liable for bad faith."). However, "[b]ecause the issues concerning an insurer's claims handling decisions are 'for the jury,' Courts grant motions for summary judgment concerning 'bad faith' in rare circumstances." *Batchelor v. Geico Cas. Co.*, No. 6:11-cv-1071-Orl-37GJK, 2014 WL 7224619, at *9 (M.D. Fla. Dec. 17, 2014) (citing *Thomas v. Lumbermens Mut. Cas. Co.*, 424 So. 2d 36, 38 (Fla. 3d DCA 1982)).

Here, questions of fact persist as to Defendant's assessment of Plaintiff's claim. Notes from Defendant's claims adjusters provide contradictory evaluations of the impact of the collision. On June 1, 2006, the reserve was set at $8,000 because the collision was a "pretty good impact" and Plaintiff had no prior injuries. Later that month, Defendant offered Plaintiff $5,000 for injuries resulting from a "minor to moderate impact." (Doc. 51-1 at 144). Additionally, Myrick speculated that Plaintiff's injuries pre-dated the collision, (*id.* at 140–41), in contradiction to Plaintiff's medical evaluation which stated that they were caused by the collision, (Doc. 52-1 at 19).

The record reflects additional evidence that would permit a jury to conclude that Defendant failed to attempt in good faith to settle Plaintiff's claim. Myrick assessed the value of Plaintiff's claim at $8,000 after receiving Plaintiff's demand package detailing that Plaintiff incurred over $10,000 in medical expenses and estimated her future medical costs at $8,000. Myrick did not include future medical costs in her assessment despite Dr. Brockman's diagnosis that Plaintiff's injuries were permanent. Later, Plaintiff provided additional medical records showing that Plaintiff received an epidural block to her lumbar spine, with mixed results, and received a recommendation for surgery from her orthopedic surgeon in the event such treatment was not successful. The proposed surgery was estimated to cost between $30,000 to $40,000. (Doc. 47-1 at 7). Defendant

increased its offer to $17,500 but refused to tender the policy limits. While Defendant correctly points out that it was entitled to a reasonable amount of time to investigate Plaintiff's surgical recommendation, the Court must examine the totality of Defendant's conduct in this case. The evidence presented by the parties, when viewed as a whole, could support a verdict in favor of Plaintiff. *See Hines v. GEICO Indem. Co.*, No. 8:14-cv-1062-T-24-TGW, 2015 WL 7450112, at *5 (M.D. Fla. Nov. 24, 2015) (finding that issue of whether the insurance company acted in bad faith was a question for the jury where the insurance company failed to settle the claim for the policy limits and where, among other things, claimant suffered permanent injuries, provided estimates of future medical costs, and noted that there was a possibility of surgery). Therefore, Defendant's Motion for Summary Judgment will be denied.

### IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 37) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on June 18, 2019.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record